UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 25-CR-80089-MIDDLEBROOKS/MATTHEWMAN

UNITED STATES OF AMERICA,

v.

CHARLES LAWRENCE BAUGH, SR.,

       Defendant.

_____/

## CHARLES LAWRENCE BAUGH SR'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE

On behalf of Charles (Chuck) Lawrence Baugh, Sr., we respectfully submit this sentencing memorandum with incorporated motion for a downward variance to a term of probation that includes a period of home confinement.

### I.    INTRODUCTION

Mr. Baugh's offense occurred more than five years ago in 2020. Both before and since his misconduct, Mr. Baugh has led a law-abiding life. Until now, however, the Court has understandably had a limited perspective of Mr. Baugh. This memorandum presents a broader understanding of Mr. Baugh, his life, and the positive and redemptive steps he has taken to address his behavior through genuine remorse and extraordinary recognition of his wrongdoing. As a tangible testament to Mr. Baugh's character, he has included supporting exhibits, including letters from those who know him best both personally and professionally.

While Mr. Baugh's presentence investigation report ("PSR") establishes that under the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G"), his total offense level is 15 resulting in an advisory Guideline range of 18 to 24 months, we respectfully move the Court to vary downward to a non-custodial sentence of probation with a term of home confinement. As described in greater detail below, there are numerous compelling reasons the Court should impose a non-custodial sentence consistent with the purposes of sentencing under Title 18, United States Code, Section 3553(a), including among others: the aberrant nature of the offense which occurred more than five years ago; Mr. Baugh's otherwise law-abiding life; his extraordinary acceptance of responsibility before both the SEC and DOJ; the need for his continued medical care of his ill mother and two

sons; the need for him to run the family business; his supportive nature and good works; his age and health; his payments to the SEC that will satisfy a forfeiture money judgment; and the toll this case has had on all aspects of his life. *See* U.S.S.G § 1B1.4 (courts may consider without limitation any information about defendant's background, character, and conduct).

## II.   FACTORS UNDER 18 U.S.C. § 3553(A)(1)

### a.   <u>Mr. Baugh's Personal History</u>

Mr. Baugh, age 60, was born in Pennsylvania. His biological parents, however, raised him and his four siblings in Texas in a loving environment under middle socioeconomic conditions. He graduated from high school in Lubbock, Texas in 1983. He then attended Texas State University (formerly Southwest Texas State University) where he studied microbiology from 1989 to 1992. Prior to earning a degree, Mr. Baugh moved to South Florida in 1992 to begin a family business with his parents and two of his siblings that continues to operate today.

The family business is a bio-tech company that manufactures bacteria and fungi for environmental cleanup, odor control, and agricultural plant growth, among other uses. Prior to helping start the family business, Mr. Baugh's late father, who had a Ph.D. in Physiological Bacteriology, was previously employed by: i) the U.S. Army Biological Laboratories at Fort Detrick, Maryland where he was involved in a state sponsored research project with *Yersinia pestis*, the causative agent of the bubonic plague; ii) Merck & Co., Inc. where he helped develop the MMR vaccine; and iii) Texas Tech University where he served as an associate professor who taught microbiology.

For 29 years, Mr. Baugh has been married to his wife, Alyson, who he met in 1994. Since their marriage, they have resided in Palm Beach County. Mr. and Mrs. Baugh have three children—Maggie, Charles, and Samuel, who are 25, 23, and 19, respectively. Maggie resides in Nashville, Tennessee where she works as a professional entertainer and musician. Charles resides with Mr. and Mrs. Baugh and is employed as a cybersecurity expert. Samuel is a sophomore college student who resides at home when school is not in session.

Letters from his family leave no doubt that Mr. Baugh has strong loving relationships with his wife and three children. In a letter to the Court from his wife, she describes Mr. Baugh as the "rock" of their family:

My husband has always been a devoted and hands-on father. He has supported our children through both joyful milestones and some extremely difficult challenges, including serious health conditions that led to multiple hospitalizations for our youngest child. Through it all, he remained steady, loyal, and determined to help our family heal and thrive. Chuck has always been the rock of the family, sometimes that is in the forefront or the background keeping things together so that we (family) can be the best versions of ourselves.

…

As a couple, we enjoy a simple life, often spending time together in our RV, traveling and connecting through the kind of moments that don't cost much but mean everything. That's the heart of who we are—a family grounded in adventure, love, and resilience.

Letter from Alyson Baugh attached as **Exhibit A**. His daughter, Maggie, further explains in a letter to the Court how supportive Mr. Baugh has been in her life:

My dad is the kind of person that you can tell everything and anything to always no matter what. The kind of person who is there for you through thick and thin, and the kind of loyal man you wish was your friend, husband or dad. He was always there fighting in my corner, starting at six years old when I asked to play violin. My dad saw the little spark in my eye that now 19 years later brought me to performing at the Grand Ole Opry. He was my roadie and put thousands of miles on his truck, taking me to and from any city that would let me perform. He was my booking agent, spending hours and hours emailing venues, hoping they would let his daughter play at least 1 song. He was the kind of guy that told me I had to carry my violin around 24/7 because I never knew who was watching me, and that got me to play with Charlie Daniels.

To funding my very first album and taking me to Nashville, he was always there. Fast-forward all these years later, I can honestly say the only reason that I am performing with Keith Urban and playing the Grand Old Opry, is because my dad always taught me to push myself and be the best version of myself I can be every single day. The reason why I have been able to self-fund my own career and be the business woman I am is because my dad taught me how to do it.

Letter from Maggie Baugh attached as **Exhibit B**.

### b. <u>**Mr. Baugh's Extraordinary Acceptance of Responsibility Warrants a Significant Downward Variance**</u>

We anticipate that the Government will agree that Mr. Baugh has demonstrated extraordinary acceptance of responsibility both before the United States Securities and Exchange Commission ("SEC") in an enforcement case based on the same underlying facts and the United States Attorney's Office ("USAO") in the instant case. For the reasons explained below, Mr. Baugh should receive a significant downward variance from the applicable Guidelines to a term

of probation that includes a period of home confinement based on his extraordinary acceptance of responsibility.

### i. SEC Case

The SEC first launched a civil regulatory investigation into Mr. Baugh's insider trading. Unaware of any criminal interest at the time, Mr. Baugh directed counsel to contact the SEC and resolve the case without the need for further investigation. Counsel did so and Mr. Baugh settled the SEC matter without the SEC having to expend investigative time and resources. Specifically, in *Securities Exchange Comm'n v. Baugh*, Case No. 24-cv-80919-DMM ("SEC Case"), Mr. Baugh voluntarily consented to a final judgment subjecting him to: i) a permanent injunction prohibiting him from engaging in future violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; ii) disgorgement in the amount of $320,908; and iii) a civil penalty in the amount of $473,660. (*See* SEC Case, DE 3, 4, 5).

In accordance with the Final Judgment, Mr. Baugh began making his disgorgement and civil penalty payments to the SEC. From August 2024 to February 2025, Mr. Baugh paid the SEC a total of $506,985, which is $82,281 more than his personal gain *combined with* the gains of the two tippees. During this time, Mr. Baugh continued to be unaware of any criminal investigation or interest in his conduct. This shows that Mr. Baugh did not enter into a settlement with the SEC to merely minimize his criminal culpability. He did so "with genuine intent to make amends for his wrongdoing." *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (unpub.) (per curium) (affirming a sentence reduction for an insider trading defendant with an advisory Guideline range of 18 to 24 months to 3 years' probation, including 6 months home confinement, in part because he made prompt payments to the SEC prior to the existence of a criminal investigation).

### ii. Grand Jury Investigation and Criminal Case

On or about April 10, 2025, Mr. Baugh discovered that a grand jury sitting in the Southern District of Florida issued subpoenas to some of his family members concerning the same trading at issue in his SEC case. Within days, he retained and met with the undersigned counsel.

Overwhelmed with guilt, Mr. Baugh quickly decided that regardless of the ultimate outcome, he needed and wanted to accept responsibility for his conduct. Knowing that he had engaged in insider trading, Mr. Baugh believed it was unfair: i) for his family members, who were unaware of his offense, to be investigated; ii) for grand jurors to expend their time investigating

his conduct; and iii) for law enforcement to use its time and resources on him when it could be investigating or prosecuting other matters. Accordingly, unlike most targets of a grand jury investigation who wait to see whether they are contacted or indicted before reaching out to the Government, Mr. Baugh directed defense counsel—like he previously did with the SEC—to reach out to the USAO to engage in plea discussions.

By April 18, 2025, defense counsel contacted the USAO requesting to discuss the investigation. Shortly thereafter, the defense and Government engaged in plea discussions. Remarkably within about a month, Mr. Baugh signed the resulting plea agreement and factual proffer on May 22, 2025. This timely acceptance is atypical for white collar cases, which often involve lengthy investigations spanning years with numerous documents and interviews. There is no question that Mr. Baugh's timely acceptance of responsibility for his conduct was extraordinary and saved grand jurors and the Government time and resources investigating and prosecuting him. *See also*, U.S.S.G. § 3E1.1 cmt. n. 1(c) ("the timeliness of the defendant's conduct in manifesting the acceptance of responsibility" is an "appropriate consideration" for acceptance of responsibility at sentencing).

Letters from family and friends to the Court describe how Mr. Baugh has also accepted responsibility for his actions. The following excerpts describe such acceptance:

- Watching [my dad] navigate this extremely difficult chapter in his life has been heartbreaking, but it's also been a clear reminder to me of the importance of accountability—something I've watched him take very seriously. We have had honest and difficult conversations about the situation he is in. I know he regrets what he did deeply and understands the seriousness of his actions. He hasn't once tried to make excuses or place blame elsewhere. What I've seen instead is someone determined to accept responsibility and use this moment as a turning point in his life. That takes strength, and I admire him for it. Letter from Charles Baugh, Jr. attached as **Exhibit C**.

- Chuck did not mince words regarding what he did – he told me where he received the information that he had and what he did with it and how wrong he was. It was clear to me that Chuck was ashamed of himself. We discussed the fact that this was a terrible lapse in judgment and very out of character for him. I believe that Chuck is deeply remorseful for his actions and has done everything possible to take full responsibility and atone for his bad deeds. Letter from Sequoyah Perry, Jr., Esq. attached as **Exhibit D**.

- When Chuck told me about the trouble he was in, he didn't deflect. He owned it. He was remorseful. Not in a superficial way, but you could see it wore on him. He's deeply ashamed and genuinely wants to make things right. I believe him when he

says he regrets what happened. It's clear that he understands the seriousness of his actions. Letter from Dr. Adrea R. Samoleski attached as **Exhibit E**.

As a result of such timely acceptance of responsibility before both the SEC and DOJ, Mr. Baugh respectfully seeks a significant downward variance from his applicable Guidelines to a sentence of probation with a period of home confinement. *See United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (finding that the district court properly reduced a sentence to probation for a defendant convicted of filing false income tax return with an advisory Guideline range of 10 to 16 months, in part, because defendant "accepted responsibility. . . . to an extraordinary degree" and "'didn't put the United States through its paces' but had 'owned up to [his] crime.'").

### c. Mr. Baugh's Role as a Designated Health Care Surrogate to his Mother and Sons Provide Reasons to Grant a Downward Variance

#### i. Mr. Baugh's Medical Responsibilities to his Mother

Life changed in the Baugh family forever when Mr. Baugh's mother, Jayne, who is 85, was diagnosed with Alzheimer's disease. Mr. Baugh is one of his mother's designated healthcare surrogates along with two of his siblings. As the disease has progressed, however, Mr. Baugh has become the sole family member who handles his mother's medical needs. He arranges her nursing care, attends her medical appointments, interfaces with her physicians, and routinely visits her, among other things. As a result of the disease, however, the family believes that Mr. Baugh's mother associates him with her late husband because she interacts with Mr. Baugh in a peaceful manner while she is often distressed and disoriented when interacting with Mr. Baugh's siblings and other family members.

Mr. Baugh is concerned that if he is incarcerated, his absence will not only negatively impact his mother's care, but it may also result in his mother's forgetting him entirely.[1]   Family and friends have expressed their concerns about the same need for Mr. Baugh's continued care of his mother. Excerpts from letters to the Court describe Mr. Baugh's care:

- Chuck's generosity and care reach far beyond his immediate household. He is a devoted son, brother, husband, and father, and I have never known anyone more committed to caring for his elderly mother. He quietly dedicates his time to her without ever seeking recognition, often sacrificing his own to ensure she is

---

[1] If the Court determines that a probationary sentence with a term of home confinement is appropriate, Mr. Baugh informs the Court in advance that at his sentencing hearing, he would respectfully request that the Court permit him to continue to attend to his mother's medical needs, which would require him to attend medical appointments and meet with her at her home.

comfortable and supported. This includes accompanying her to medical appointments and visiting her nearly every day to make sure she is cared for and feels loved. His loyalty and sense of responsibility to his family are simply part of who he is at his core. Letter from Danielle Baugh attached as **Exhibit F**.

- Chuck spends the most time of the siblings helping our mother, because of the dementia, she can be irrational and angry with me and her aides. Many times she is unwilling to go to doctor appointments or allow the aides to take care of her and as her daughter she won't listen to me. However, she trusts Chuck and sees him as an authority figure and will comply when he goes with her to the appointments or when Chuck talks with her in person. She doesn't remember family members that she doesn't see regularly and it is a huge concern that an extended separation could result in her losing memory of him. Chuck discusses her many health concerns with her doctors to make overall decisions concerning her care. Letter from Barbara B. Friend attached as **Exhibit G**.

- In addition to the above points, I feel it's important to point out Chuck's outsize role in our mother's healthcare. Mother is 84 with dementia. She's had several falls resulting in surgeries and requires a lot of healthcare. Most of the organizing and decisions for this care fall on Chuck's shoulders. Letter from Thomas Baugh attached as **Exhibit H**.

- Charles's mom's diagnosis took the family by surprise. How Charles addressed the issue demonstrated a vital component of her care. Jayne's consistent repetitive questions, decline in mobility and loss of parental roles require devotion, tolerance and true dedication to remain involved in her care. Since his dad's passing, Charles Baugh remains a vital role in his mother's health journey. Absence from his contribution would be detrimental to Jayne's prognosis. Letter from Evelyn Boyle, RN attached as **Exhibit I**.

- The past few years have been difficult for our family as our parents have aged. We made the decision to hire live-in aides to help them stay in their family home. Chuck has been the point person with the aides, making sure Mom & Dad get to medical appointments and that all of their other needs are met. When the house needed changes to make their life easier, Chuck was the one dealing with contractors and repairmen. At one point, Chuck took it upon himself to assemble and install a hospital bed. Not an easy task, yet he accomplished it without a complaint. Letter from Bill Baugh attached as **Exhibit J**.

- Chuck, in recent years has also assumed the role of primary contact for the care of his aging parents. His father recently passed, leaving his mother, Jayne, who is suffering from Alzheimer's and is recovering from a second hip fracture and surgery, dependent on Chuck. Chuck is the first one to be called for any medical or daily household management issues that need attention. Letter from Yvette Baugh attached as **Exhibit K**.

- Chuck's father recently passed away and his mother is under constant nursing care suffering from a variety of ailments, including dementia. He attends to many of her personal needs outside the scope of these medical professionals. From taking her to medical appointments and speaking with the doctors to managing her finances. <u>Letter from Gerard L. Samoleski, III</u> attached as **Exhibit L**.

### ii.   Mr. Baugh's Medical Responsibilities to his Sons

In addition to caring for his mother, Mr. Baugh is the designated health care surrogate for both of his sons who both have a rare medical condition called glycogen storage disease, type IX ("GSD").  GSD is an inherited metabolic disorder that affects the body's ability to break down glycogen, a complex carbohydrate stored in the liver and muscles. This disease causes frequent low blood sugar, muscle weakness, and liver damage. Without proper medical care and diet, it can be life-threatening. Both of Mr. Baugh's sons have weakened immune systems requiring daily medication to include medical grade protein.

Mr. Baugh's sons' physician, Dr. David A. Weinstein, one of the world's preeminent physicians who specializes in GSD, provided a letter to the Court describing how in 2007 one of his sons was airlifted to Miami Children's Hospital after being found minimally responsive with life-threatening hypoglycemia. He explains:

> Through frequent visits to our center in Florida and subsequently at the University of Connecticut along with recurrent interactions by phone while dealing with metabolic crises, I got to know Mr. Baugh quite well, and I can say with confidence that the events surrounding this case are not indicative of the person that is a hard-working, dedicated father willing to do whatever was required to keep his children healthy.  His empathy, however, went beyond his children, and **Chuck was willing to help other children living in the region with this condition who otherwise would have struggled due to lack of resources.**
>
> …
>
> While his children are getting older, Chuck is still the primary supporter when acute medical events occur. He is also caring for his mother who has dementia, and he appropriately is concerned that his inability to be there for his family will have potential dire consequences on them.
>
> …
>
> **In fact, it is rare to see a father take such responsibility with caring for children with medical conditions, and Chuck has been the most dedicated, responsible parent of any father in my practice**.

<u>Letter from David A. Weinstein, MD, M.M. Sc.</u> attached as **Exhibit M** (emphasis added).

Courts have recognized family responsibilities as a reasonable ground for a downward variance from the advisory Guidelines. For example, in *United States v. Prosperi*, 686 F.3d 32, 34 (1st Cir. 2012), the defendants were convicted by a jury of, among other offenses, conspiracy to defraud the United States. *Id*. With a guideline range of 87 to 108 months of incarceration, the district court sentenced the defendants to six months of home monitoring, three years of probation, and 1,000 hours of community service, in part, because one of the defendants' wives was battling terminal cancer. *Id*. at 40-41. *See also*, *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (sentence of 1 year and 1 day for a man who possessed with intent to distribute 100 grams of heroin, despite guideline range of 46-57 months, based on his long work career, community support, lack of criminal record, and responsibilities as sole supporter of 8-year-old son and elderly parents, which reduced the likelihood he would reoffend).

While the Eleventh Circuit found in *United States v. Allen*, 87 F.3d 1224 (11th Cir. 1996) that "[r]esponsibilities of defendant convicted of bank fraud as the primary caretaker of parent with Alzheimer's . . . [was] not extraordinary, and thus did not warrant five-level downward **departure** from Sentencing Guidelines," courts have recognized that Guideline "policy statements normally are not decisive as to what may constitute a permissible ground for a variant sentence in a given case." *United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008). Mr. Baugh is seeking a **variance** for his family circumstances which include his medical responsibilities to both his mother and sons. District Courts "may take idiosyncratic family circumstances into account, at least to some extent, in fashioning a variant sentence." *Id*. (quoting *Kimbrough v. United States,* 552 U.S. 85, 101, 128 S.Ct. 558, 570, 169 L.Ed.2d 481 (2007) (stating "as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines.") (other citations omitted). A downward variance to a non-custodial sentence will appropriately penalize Mr. Baugh and permit him to continue to tend to his mother's and sons' future medical needs.

### d.  Mr. Baugh is Crucial to the Family Business that Employs 7 Individuals

Since 1992, Mr. Baugh has operated the family business that he started with his brother, sister, and parents. Prior to this case, Mr. Baugh was the president of the company, Custom Biologicals ("CustomBio"), which manufactures bacteria and fungi for environmental cleanup, wastewater treatment, agricultural products, and odor control. As discussed further below, Mr.

Baugh resigned as an officer and director of the company and is now a salesperson. The business employs 7 fulltime employees – the majority of which are family members.

The business's clients include distributors, farmers, farming distributors, environmental cleanup companies, wastewater companies, and restaurants, among others. While under Mr. Baugh's leadership, the company has provided bacteria to clean up Environmental Protection Agency superfund sites, army bases, and countless oil spills. Mr. Baugh has worked on international projects that were done for need, not profit, including the cleanup of a river in Thailand and another river in India, which the World Wildlife Fund paid for to help save the endangered, freshwater, pink bottle nose dolphin.

As the company's president, Mr. Baugh primary job was developing new customers and maintaining large customers. While his title has changed, Mr. Baugh's duties remain the same. He is responsible for generating and sustaining new business. Because the business model frequently loses customers due to project completion or economic issues, Mr. Baugh's role is essential. If incarcerated, the business may not survive. Excerpts to the Court from family and friends express their concern about the business's future without him there:

- As a co-founder and President of Custom Biologicals, Chuck has spent his professional career building up our family business. Currently, Chuck is responsible for about 65% of the total revenue of Custom Biologicals. Many of his business relationships span decades and he would be impossible to replace. I am not certain that the company will survive if Chuck is incarcerated. Letter from Bill Baugh, Ex. J.

- From a business standpoint, Chuck is more than my partner. He is invaluable. He is not only responsible for overall strategy of the company, he is personally responsible for most of the customer relationships and sales. What he does is beyond my abilities and the knowledge required to fulfill his role would make it difficult, if not impossible, to replace him in a timely enough manner to keep operations running. Letter from Thomas Baugh, Ex. H.

- Chuck plays a vital role in the family business, which my husband is a part of. All five siblings rely on Custom Biologicals for their income and survival. Should he not be available it could have devastating results to many other immediate family members. Letter from Yvette Baugh, Ex. K.

- Chuck is the primary salesperson for our small family business that employs 7 people. He is an enthusiastic leader and strives to complete every task with excellence. We depend on his leadership and we can't duplicate his sales abilities or his expertise in product application. His customers also depend on that expertise to maintain and expand their businesses. If Chuck wasn't able to work, it would

jeopardize the small business and all the people who depend on it for their livelihood. <u>Letter from Barbara Friend</u>, Ex. G.

- What concerns me is that Chuck's absence, especially due to incarceration, could jeopardize the future of our company. As President, Chuck is responsible for generating most of our sales and maintaining essential partnerships. His contributions are not easily replaceable. If the company were to suffer or close as a result of his absence, it would affect not only my job, but the livelihoods of many others who work here and the farmers who depend on our products globally. <u>Letter from Alexander Calvo</u> attached as **Exhibit N**.

Employees' concerns are clearly justified because this case has already had a negative impact on the company. As a direct result of Mr. Baugh's guilty plea, the company's bank informed Mr. Baugh that it was closing the business's accounts. As described in more detail below, banks closed the accounts for *all* businesses in which Mr. Baugh had a 25 or more percent ownership interest. He, accordingly, resigned as the company's president and transferred his business ownership interests to his wife so that the company can maintain financial accounts. Without banking ability, the company could not survive.

Courts have considered a defendant's essential role in a family business as a downward variance. *See United States v. Sayad*, 589 F.3d 1110 (10th Cir. 2009) (the district court properly granted a downward variance to a defendant who was convicted of interstate delivery of 11 kilograms of cocaine and had an advisory Guidelines of 57 months to probation, in part, because he was needed in family restaurant business); *United States v. Kloda*, 133 F.Supp.2d 345 (S.D.N.Y. 2001) (in business tax fraud case, one-level departure granted in part because of "the needs of [defendant's] business and employees"); *United States v. Milikowsky,* 65 F.3d 4, 8-9 (2d Cir. 1995), (the court affirmed a downward departure, in part, because, without the defendant's continued presence and involvement, the defendant's business likely would collapse and thereby deprive his employees of their livelihood). Accordingly, Mr. Baugh seeks a downward variance to a term of probation based on the need for his crucial role in the family business.

### e. <u>Mr. Baugh's Support to Others is a Reason for a Downward Variance</u>

People describe Mr. Baugh with a common theme: a person who is kind, loyal, generous and supports others. Letters submitted on Mr. Baugh's behalf best give a window into his supportive and caring nature. As one example, Mr. Fernando Azor provides a letter to the Court explaining how, after first meeting Mr. Baugh as a dental hygienist, Mr. Baugh became his mentor and help shape him into the person he is as follows:

When I first met Chuck, I was living in Section 8 housing in a rough neighborhood called Stony Brook, located in Riviera Beach, Florida. I come from a large family, my mother raised eight children and we struggled deeply. At that time, I was surrounded by negative influences and could have easily gone down the wrong path. Chuck changed that. He encouraged me to stay focus and not fall into the lifestyle my siblings were living. To focus on becoming a better person, student, and eventually, a better man. He believed in me and shortly that made me believe in myself.

Chuck didn't just offer me words, he fed me when I didn't have food at home. He helped take care of me and supported me in ways that only a true father figure would. That's what he became to me, a father figure. Someone I could rely on, someone I respected, and someone who filled a void in my life at a time when I needed it most. One of the most impactful things Chuck gave me was knowledge.

Especially around financial literacy, something I never learned growing up. He taught me how to think long term, how to budget, how to dream bigger. I know firsthand that he still has so much to offer society, especially to kids like me growing up in difficult circumstances without role models. Chuck has the ability to guide youth in underserved communities, especially those living in Section 8 housing or growing up without a father, and teach them real, life changing skills. <u>Letter from Fernando Azor</u> attached as **Exhibit O**.

Courts have found similar acts as exceptional good works deserving of a reduction from the applicable Guideline range. For example, in *United States v. Cooper*, 394 F.3d 172, 177-78 (3rd Cir. 2005), the defendant in a securities fraud and tax evasion case, with a Guideline range of 14 to 21 months, was granted a four-level downward departure and a sentence of probation as result of his "exceptional" good works. Like Mr. Baugh, the defendant did not simply donate money to charity but also mentored an underprivileged young man, organized and ran youth football team in depressed area, and helped several members attend better high schools or go to college, which qualified as exceptional because they entail "hands on personal sacrifices which have a dramatic and positive impact on the lives of others".

Similar to Mr. Azor, excerpts from other individuals describe Mr. Baugh's supportive and loyal character:

- Chuck was there for me at every turn, helping when he could expect nothing in return other than friendship. When I had my first heart attack, it was Chuck that my wife called for support, before she called her parents, my parents or either of our siblings. That is how much my family trusts him. Years later, my daughter turned 6 years old and caught bacterial meningitis. It was Chuck who sat with me and allowed this tough old sailor to be scared, and with his background in microbiology explained to me in plain terms what was going on.  I write this to say that when

things go wrong in my world, Chuck is the first one to step up and be a friend. <u>Letter from Kevin W. Oliver</u> attached as **Exhibit P**.

- As a physician, I'm trained to assess people with compassion and clarity. With Chuck, I've seen nothing but kindness, loyalty, and generosity. He's been there for me and for others in ways that many wouldn't even think. His composure and concern in coping with difficult situations and his parents' failing health has been exemplary. The small acts of kindness he shows to others to support them on their own journey reflect a kind and generous man. <u>Letter from Dr. Adrea R. Samoleski</u>, Ex. E.

- Over the years, Chuck has become more than just my employer-he's a trusted friend. He has always made time to listen when I've faced personal challenges and has offered thoughtful, compassionate advice. When I chose to semi-retire in 2021, Chuck was understanding and accommodating, allowing me a flexible schedule that met my needs. I can say with confidence that he has been the best boss I've ever had. <u>Letter from Lillian Edlund</u> attached as **Exhibit Q**.

- Charles has consistently demonstrated kindness, responsibility, and a strong work ethic. He is a dedicated family man who prioritizes loved ones and contributes positively to his community. I have personally witnessed his willingness to help others, including supporting friends in need. A notable example is when he mentored me in 1993 as I entered the job market, offering encouragement and ongoing guidance, which he continues to do today. <u>Letter from Paula Russo Reidler</u> attached as **Exhibit R**.

- In the time I've known Chuck, I've come to respect and admire him as someone who is generous, loyal, and deeply compassionate. He has consistently shown up for those around him, whether offering emotional support during difficult times or lending a hand when someone needed help. He is the kind of person who remembers birthdays, checks in unprompted, and quietly volunteers without seeking recognition. These may seem like small things, but they speak volumes about his character. <u>Letter from Gerard L. Samoleski, III</u>, Ex. L**.**

In addition to his generosity towards his friends and others, Mr. Baugh also supports his community. In a letter to the Court, Mr. Weinstein explains:

> In addition to being a great father, Chuck has consistently demonstrated his commitment to others. During the height of the COVID-19 pandemic in May 2020, he and I personally purchased a large quantity of frozen chicken breasts from a local restaurant supply company and donated them to a local food bank. It was a gesture that helped support both a struggling business and a food bank at a time when people were in urgent need. That moment was emblematic of who Chuck is, quietly generous and committed to helping others when they need it most.

<u>Letter from Seth Weinstein</u>, **Exhibit S**.

As another example, after Mr. Baugh's sons required a service dog for their rare medical condition, GSD, the Baugh family gave back and fostered different service dogs for years while they were in training for three to six months. Mr. Baugh's sons are both Eagle Scouts who performed thousands of hours of community service. Mr. Baugh would also often attend and help with their numerous service projects. As a result, Mr. Baugh's assistance to others should be considered for a downward variance. *See, e.g.*, *United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) (affirming a 3 month sentence as time-served rather than 60 month guideline sentence crediting defendant's charitable work, community service, generosity with his time, and the spiritual support and assistance he provided to others); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (affirming downward departure based on charitable fund-raising conduct as well as poor medical condition); *United States v. Adelson*, 441 F. Supp.2d 506 (S.D.N.Y. 2006) (in securities fraud case, where Guidelines called for life sentence, the district court imposed 42 month sentence, in part, because of the defendant's past integrity and many good deeds, stating "[b]ut, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant.").

In addition, Mr. Baugh has dedicated his professional efforts to addressing environmental harm and supporting remediation initiatives domestically and abroad. He founded CustomBio in 1992 with his father and siblings. The company was initially focused on addressing the severe environmental damage caused by the oil well fires following the Gulf War.

Throughout its history, CustomBio has reflected Mr. Baugh's long-standing dedication to developing and supplying biological solutions for contamination remediation across a broad range of settings. CustomBio has provided specialized bacteria for cleanup efforts at the French Ltd. EPA Superfund site, at U.S. Army bases, and in response to oil spills in the United States and Mexico. The company has also supported odor reduction and water treatment initiatives in Florida. Collectively, CustomBio's products have been used in thousands of remediation efforts involving oil, fuel, wastewater, and grease contamination. Attached as **Composite Exhibit T** is a true and correct copy of CustomBio's case studies concerning certain of these environmental projects.

As a family-owned enterprise, the company has consistently pursued opportunities to advance environmental protection beyond purely commercial objectives. Under Mr. Baugh's leadership, the company has undertaken non-commercial, nonprofit remediation projects where environmental harm was significant but financial resources were limited. As an example, in Guatemala, the company provided septic treatment products to improve sanitation conditions at an orphanage. Attached as **Exhibit U** is a thank you letter to Mr. Baugh from "Friends of Guatemalan Children/Casa Guatemala" for CustoBio's "generous donation of Fizzy Tabs for our septic takes at the orphanage" in Guatemala. The company has also sponsored a local high school student's microbiology-based science project, covering laboratory costs and providing technical guidance, which contributed to a nationally recognized award-winning project.

Mr. Baugh's environmental commitment is further demonstrated by CustomBio's involvement in international response efforts. In India, the company addressed severe wastewater contamination being discharged into the Ganges River—an ecologically sensitive waterway that supports an endangered river dolphin species and holds deep religious significance for local communities. In Thailand, CustomBio worked with a local distributor to identify and mitigate an unknown chemical spill that was causing extensive fish mortality in river nursery ecosystems, helping to halt the spill's lethal downstream effects. **Composite Exhibit V** is a true and correct copy of CustomBio's case study concerning this environmental project.

The company continues to provide environmental remediation and pollution mitigation solutions globally, reflecting Mr. Baugh's professional commitment to protecting ecosystems, public health, and environmental sustainability.

Mr. Baugh, accordingly, seeks a downward variance based on his history of exceptional good works and service to others.

### f.   Mr. Baugh's Age and Health Issues Warrant a Downward Variance

Mr. Baugh is 60 years old. As detailed in paragraphs 66 through 82 of the PSR, he has been diagnosed with certain physical and mental health ailments that the U.S. Probation Office has verified either through family members or medical records. In lieu of repeating Mr. Baugh's health-related issues in this memorandum, the undersigned counsel will address them along with the need for medical care during the sentencing hearing.

### III.   SECTION 3553(a)(2) CONSIDERATIONS DO NOT WARRANT INCARCERATION

As this Court is aware, 18 U.S.C. § 3553(a)(2) requires the Court consider:  i) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment; to afford adequate deterrence to criminal conduct; ii) to protect the public from other crimes of the defendant; and iii) provide the defendant with training needs, medical care, or other treatment in the most effective manner. In making an individualized assessment, however, there are reasons that a probationary sentence with a period of home confinement will advance these factors.

### a.   Probation with Home Confinement is Sufficient to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Specific and General Deterrence

Mr. Baugh readily acknowledges that he committed a serious offense for which he deserves punishment. Mr. Baugh's actions, however, have already created life-lasting devastation without any sentence imposed by the Court. In *Prosperi*, the Court notes that the district court recognized the detrimental impact of a felony conviction on a person with no criminal history:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.

686 F.3d at 48.

Specifically, Mr. Baugh's actions have negatively affected his health; familial relationships; family business; financial circumstances; and reputation within his community. These collateral consequences satisfy the need to afford both specific and general deterrence. First, Mr. Baugh faces the possibility that if incarcerated, his mother afflicted with Alzheimer's disease may not recognize him when he returns to society. Second, Mr. Baugh has been the subject of governmental press releases as well as widespread media attention, including articles in the *Palm Beach Post*, *Miami Herald*, and *Orlando Sentinel*, among others. These press releases and articles will forever reflect this case as Mr. Baugh's public legacy. Without question, this widespread public media attention provides both specific and general criminal deterrence to an otherwise law-abiding citizen.

Third, because of his actions, Mr. Baugh has faced difficult financial problems: i) he has already paid more than $500,000 to the SEC in disgorgement and civil penalties; ii) a bank cancelled his family's business line of credit and called it due; iii) a bank cancelled his family's business real estate mortgage and called it due; iv) a bank cancelled both his business bank accounts and his personal accounts; v) a firm closed his retirement accounts; and vi) financial institutions cancelled nearly all of his credit cards. Finally, for the family business to open and maintain bank accounts, Mr. Baugh had to resign as president of the family business that he founded in 1992 and divest himself of any ownership interests more than 25%. Mr. Baugh is currently a salesperson for the company and cannot hold an officer role again if the business wants to have financial accounts. *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 182 (E.D.N.Y. 2016) (stating "[t]oday, the collateral consequences of a felony conviction form a new civil death. Convicted felons now suffer restrictions in broad ranging aspects of life that touch upon economic, political, and social rights.").

### b.  Probation with Home Confinement will Serve to Protect the Public

Mr. Baugh has been married for 29 years, has raised three children, has consistently been employed, and has no criminal history. He is neither a dangerous nor violent person who needs to be imprisoned to protect the public. Indeed, his conduct more than five years ago clearly constitutes aberrant behavior that warrants a sentence reduction. There is no question that a sentence without incarceration is more than sufficient to protect the public from Mr. Baugh.

In considering recidivism, the Court should strongly consider Mr. Baugh's age (60) and criminal history. There are:

> [s]tudies by the Sentencing Commission indicate that increased age predicts a lower recidivism rate. So does a Category I criminal history or, even more, zero points for a criminal history. Prior arrests appear to predict an increased recidivism rate. *See U.S.S.C., "Recidivism and the 'First Offender'" May 2004; U.S.S.C., "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines" May 2004.* Both documents are available at www.ussc.gov/publicat.

*United States v. Martinez*, 2007 U.S. Dist. LEXIS 12514, *5 (D. Kan. February 21, 2007). *See also,* U.S. Sent'g Comm'n, *Older Offenders in the Federal System*, at pp. 41-43 (July 2022) (finding that "the recidivism rate of older offenders (21.3%) was less than half that of offenders under the age of 50 (53.4%))," which is available on the Commission's site at Older Offenders in the Federal System (last visited Sept. 15, 2025). In imposing the least sentence sufficient to account

for the need to protect the public from further crimes of Mr. Baugh, this Court should consider the statistically low risk of recidivism presented by his history and characteristics. *See, e.g., United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime).

In addition, the public is protected by this Court's final judgment in Mr. Baugh's parallel SEC case. Based on Mr. Baugh's consent, your Honor entered a final judgment subjecting Mr. Baugh to: i) a permanent injunction prohibiting him from engaging in future violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; ii) disgorgement in the amount of $320,908; and iii) a civil penalty in the amount of $473,660. (*See* SEC Case, DE 3, 4, 5). Since the injunction was entered in August 2024, Mr. Baugh has had no violations. Instead, he has already paid the SEC a total of $506,985 in disgorgement and civil penalties. Moreover, considering that *any* violations are subject to the felony offense of criminal contempt, the injunction serves to protect the public from Mr. Baugh engaging in similar conduct without the need for a custodial sentence.

### c.   <u>The Court May Sentence Mr. Baugh to Probation</u>

This Court must consider the kinds of sentences available. *See* § 3553(a)(3). "[The Guidelines are only one of the factors to consider when imposing sentence, and § 3553(a)(3) directs the judge to consider sentences other than imprisonment." *Gall*, 552 U.S. at 59; 128 S. Ct. at 602 and at n.11. As part of any sentence, the Court may make all, or a portion of it, probationary as long as doing so is not prohibited by statute, which it is not here. The Court is permitted to sentence Mr. Baugh to probation. (*See* DE 22, ¶113) (stating "[Mr. Baugh] **is eligible** for a term of not less than one nor more than five years' probation by statute, 18 U.S.C. § 3561(c)(1).") (emphasis added).

In *Gall*, the Supreme Court recognized that:

> custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. **Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty**. See *United States v. Knights, 534 U.S. 112, 119, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001)* ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quoting *Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987)))*. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from

associating with any person convicted of a felony, and refrain from excessive drinking. *USSG § 5B1.3*. Most probationers are also subject to individual "special conditions" imposed by the court.

*Id*. at 456. (emphasis added).

### d. <u>The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Found Guilty of Similar Conduct</u>

18 U.S.C. § 3553(b)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Courts have imposed sentencing reductions like Mr. Baugh's requested sentence for similarly situated defendants with similar types of conduct.

In *Anderson*, the defendant was similarly situated to Mr. Baugh. 267 F. App'x at 849-850 (11th Cir. 2008) (unpub.) (per curium). Like Mr. Baugh, the defendant: i) first settled a case with the SEC for engaging in insider trading without a pending, parallel criminal matter; ii) made "prompt" disgorgement and civil penalty payments to the SEC without knowledge of any criminal investigation; iii) pled guilty to insider trading; iv) had a Guideline offense level of 15 with an advisory Guideline range of 18 to 24 months; and v) was over 50, supported college-aged children, faced employment issues, and suffered reputational damage. *Id*. In affirming a sentence reduction from 18 to 24 months to three years' probation, including six months' home confinement, the Court found that the district court properly assessed the following section 3553 factors: i) the defendant's payments to the SEC while there was no ongoing criminal matter showed his "genuine intent to make amends for his wrongdoing;" ii) the defendant's "other negative consequences from the fact of the civil judgment and perhaps also from the specter of the criminal sentence," which included employment loss and diminished income; and iv) the defendant's reputational damage. *Id*. Given both the factual and Guideline similarities between the defendant in *Anderson* and Mr. Baugh, the Court should sentence Mr. Baugh to probation with a term of home confinement to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(b)(6).

### e. <u>Restitution is Inapplicable and a Fine is Unwarranted</u>

As in paragraph 40 of the PSR, the Government has agreed that there is no restitution in this case. Mr. Baugh, however, agreed to pay a forfeiture money judgment in the amount of $316,044. (DE 16 at ¶¶ 13-14). The parties further agreed that upon proof of payments, the USAO would credit any money Mr. Baugh already paid the SEC towards his forfeiture money judgment.

Defense counsel has provided the Government with proof that from August 2024 to February 2025, Mr. Baugh paid the SEC a total of $506,985. This means that Mr. Baugh has paid $82,281 more than his personal gain combined with the profits from the two tippees. In reviewing the factors under 18 U.S.C. § 3572, including "the need to deprive the defendant of illegally obtained gains from the offense," a criminal fine is unwarranted.

### IV.   CONCLUSION

This memorandum provides only a small window into the history and characteristics of Mr. Baugh, who, more than five years ago, engaged in his first, only, and last criminal offense. Since 2020, Mr. Baugh has been a productive member of society without any issues.[2] There is no need to subject him to a custodial sentence. A probationary sentence with a period of home confinement is "sufficient, but not greater than necessary" to comply with the purposes of sentencing.

Thus, Mr. Baugh respectfully moves, based on the Guidelines and the § 3553(a) factors set forth above, the Court to vary downward from his advisory Guideline range to term of probation that includes home confinement.

Dated: December 29, 2025                           Respectfully submitted,

                                                   SALLAH ASTARITA & COX, LLC

                                                   s/Jeffrey L. Cox
                                                   Jeffrey L. Cox
                                                   Florida Bar No. 0173479
                                                   James D. Sallah
                                                   Florida Bar No. 092584

                                                   3010 North Military Trail, Suite 210
                                                   Boca Raton, Florida 33431
                                                   Tel: (561) 989-9080
                                                   Fax: (561) 989-9020
                                                   Email: jlc@sallahlaw.com;
                                                   jds@sallahlaw.com

---

[2] Notably, additional character letters that are not already referenced in this Memorandum are attached as **Composite Exhibit W**.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served by filing via the

Court's CM/ECF filing system and via e-mail on all counsel or parties of record on the Service

List below.

<u>s/ Jeffrey L. Cox</u>

## <u>SERVICE LIST</u>

Eli S. Rubin
Assistant United States Attorney
99 N.E. 4th Street
Miami FL, 33132-2111
E-mail: Eli.Rubin@usdoj.gov

*Counsel for the United States of America*